J-S33018-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3536 EDA 2017 |

Appeal from the Order October 4, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000913-2017

BEFORE:   OTT, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                 **FILED JUNE 11, 2018**

D.L.K. ("Father") appeals from the order terminating his parental rights to A.J.K. ("Child"). Because we conclude that the trial court did not abuse its discretion in terminating Father's parental rights, we affirm.

Child, born October 2010, has two siblings, Z.L.K., born June 2001, and C.K.[1] On March 9, 2015, the Department of Human Services ("DHS") received a general protective services report alleging that Z.L.K. was truant, that the school had attempted to contact her parents, that she was two school grades below her grade level, and that there were concerns regarding the condition

_____

\* Former Justice specially assigned to the Superior Court.

[1] C.K. was "about 20 years old" in 2015. N.T., 10/4/17, at 13.

of the home.[2] N.T., 10/4/17, at 10-11. DHS made approximately four attempts to visit the home, and, although DHS observed people inside the home on at least one occasion, no one responded. *Id.* at 11.

Father and S.K. ("Mother") continued to refuse DHS access to the home until April 27, 2015, after DHS received police assistance and obtained a break-down order from the trial court. *Id.* at 11-12. Once inside the home, DHS discovered that the home was in deplorable condition. There was "trash from the door all the way to the top of the top floor," *id.* at 12, including empty soda bottles, pizza boxes, broken toys, and dog waste, *id.* at 12-13. The home had a "stench of dog, dog urine, feces, old food, [and] garbage." *Id.* at 19-20. The bathtub was filled with trash. *Id.* at 21. The children's beds did not have bedsheets, the refrigerator had no food, and the stove did not work. *Id.* at 12-13. Further, the home's garage contained car parts from floor to ceiling. *Id.* at 12.

DHS met with Z.L.K. and Child, both of whom were not well kept. *Id.* at 14, 20.[3] Z.L.K. informed DHS that she had not had her hair done in a year or

_____

[2] DHS had also received allegations that Z.L.K. was truant on January 13, 2012, and November 14, 2013. DHS was unable to contact the parents to investigate the allegations.

[3] DHS may have been able to speak with Z.L.K. and Child prior to April 28, 2015. *See* Trial Court Opinion, filed Jan. 24, 2018, at 4-5 (stating that on April 14, 2015, Father answered door and, although he did not allow DHS to enter the home, DHS did speak with Children); Petition for Involuntary Termination of Parental Rights, at Ex. A, Statement of Facts, filed 9/18/2017, at ¶ h (same). The facts as outlined in this memorandum are from the testimony at the hearing on the Petition for Involuntary Termination of Parental Rights.

two and did not know the last time she had taken a bath. *Id.* at 20-21. DHS noted that Child had bruising on different parts of his body. *Id.* at 14. Further, Child had not received well-child visits or immunizations for the past two-to-three years. *Id.* at 19.

DHS obtained an Order for Protective Custody. The trial court adjudicated Child dependent on May 19, 2015. Shortly after being removed from the home, Child was placed with S.T. ("Foster Mother").

The trial court held numerous permanency review hearings following Child's placement. Father's goals varied, but included: cleaning the home of debris and other items that posed a safety threat to Child, visiting with Child, applying for medical coverage, and attending individual therapy.

On September 18, 2017, DHS filed a Petition for Involuntary Termination of Parental Rights to Child.[4] The trial court conducted a hearing.[5] At the hearing, George Siti, a DHS worker, outlined the case's history prior to adjudication. N.T., 10/4/17, at 9-26. In addition, Dr. Erica Williams, Psychologist and Director of Forensic Services, testified. She had conducted a parenting capacity evaluation and an addendum parenting capacity evaluation for Father. *Id.* at 27. Following a March 15, 2016 parenting capacity

---

[4] DHS also filed a petition to terminate Mother's parental rights to Child, and the trial court terminated Mother's parental rights to Child on the same day it terminated Father's rights. Mother filed a Notice of Appeal, which is docketed at 3534 EDA 2017.

[5] For a complete factual history of this case and an extensive summary of the evidence presented at the hearing, please see the Trial Court Opinion, filed Jan. 24, 2010, at 1-33.

evaluation, Dr. Williams opined that Father did not present with the capacity to provide safety and permanency to Child. *Id.* at 46. She noted his non-responsiveness to Z.L.K.'s truancy, his refusal to allow DHS in the home, his projection of his issues onto others, and the conditions of the home. *Id.* at 46-47. Following a January 2017 parenting capacity evaluation, Dr. Williams again opined that Father did not have the capacity to provide safety or permanency for Child, noting that the same concerns from March 2016 continued to exist. *Id.* at 49. She noted that although Father was complying with his objective to attend therapy, the compliance was "not translating into [Father] addressing the issues of concern." *Id.* at 54. She noted that in therapy Father needed to focus on "understanding the role [he] played in the children's removal, taking accountability and ownership for [his] parenting and the neglect that occurred and helping [him] work towards developing a plan that that wouldn't occur again." *Id.* at 67.[6]

Dr. Williams also conducted a bonding evaluation. *Id.* at 27. She noted that Child hid behind Foster Mother when he saw Father and that Child stated he did not want to live with Father. *Id.* at 51-52. She observed that Child engaged with Father and allowed Father to tickle him, but that Child was unresponsive when Father requested that he pick up the toys. *Id.* at 52-53.

---

[6] At the time of the evaluations, Dr. Williams had requested, but had not received from NHS Human Services ("NHS"), Father's mental health records. N.T., 10/4/17 at 69-70.

Dr. Williams opined that Child would not suffer irreparable harm if the trial court terminated Father's parental rights. *Id.* at 53.

Reginald Nelson, the case manager at Catholic Community Services, a Community Umbrella Agency, also testified. He stated that there were issues in the current home, including that DHS observed drug paraphernalia in the home and that it had concerns regarding the individuals living in the current home. *Id.* at 75-76. Mr. Nelson stated he observed no issues with hoarding, but did observe issues of cluttering. *Id.* at 77. He stated that the last of the home improvements—installation of the fire alarm and fixing a light—had been completed. *Id.* Mr. Nelson stated that Child struggles during the visits with Father and he has no difficulty leaving at the end of a visit. *Id.* at 82-83. He further testified that Child has a positive relationship with Foster Mother. *Id.* at 85. He stated that terminating Father's parental rights would be in Child's best interest, *id.* at 105, and that Child is secure, is in a safe environment, and has a strong bond with his foster family. *Id.* at 85. Mr. Nelson noted that Father does not call him to inquire about Child's well-being. *Id.* at 86. He further noted that Child made allegations that, before being removed from Father and Mother's home, he had been locked in the trunk of Mother's car and locked in his room. *Id.*

Dr. Beverly Ingles, a psychologist, also testified. She sees Child in therapy on a bi-weekly basis. *Id.* at 108. Dr. Ingles stated that Child is very responsive to Foster Mother, and is very well bonded with her. *Id.* at 114. She has observed that Child's visits with his parents are very difficult for Child.

Child has nightmares after the visits and states he does not like his parents because they are bad. *Id.* at 114-15. She further testified that Child refers to Father and Mother by their first names and refers to his foster parents as mom and dad. *Id.* at 115. She opined that it would be harmful and have "devastating effects" to remove Child from the foster home. *Id.* at 117.

Foster Mother testified that when Child arrived he was "sad, frightened and confused." *Id.* at 122. She said Child was clingy, had nightmares, and asked her to stay by his bed at night. *Id.* She stated that Child is much better now, that her relationship with Child is excellent, and that he goes to her and her husband with his fears and anxieties. *Id.* at 124.

Father next testified. He stated Child enjoyed the visits with Father, where they played games and had fun. *Id.* at 127-28. He noted Child became cooler with him during visits at the Agency. *Id.* at 129. He stated he repaired the lighting fixtures and fire alarm in the house in which he and Mother are residing. *Id.* at 130. He obtained a certificate of completion from Project Positive Parenting and attends therapy at NHS. *Id.* at 133, 136. Father testified that he had rectified the hoarding issues and obtained medical insurance. *Id.* at 145. Father also claimed the therapy enabled "[him] to accept the ownership of the—of things that I've done as far as not ensuring that my children went to school consistent as far as—my daughter especially. Or ensuring that they saw doctors consistently." *Id.* at 144. He said he "owned" those facts, but could not "do anything about them right now because I don't actually have the children." *Id.*

On October 4, 2017, the trial court terminated Father's parental rights, finding DHS presented clear and convincing evidence for termination of Father's parental rights under Sections 2511(a)(1), (2), (5), and (8) of the Adoption Act, and that termination would be in Child's best interest under Section 2511(b). 23 Pa.C.S.A. § 2511(a)( 1), (2), (5), (8), (b). Father filed a timely notice of appeal.

On appeal, Father raises the following issues:

> 1. Did the Department of Human Services (DHS) sustain the burden that Father's rights should be terminated when there was evidence that Father had completed and/or had been actively completing [his] permanency goals?
>
> 2. Was there was sufficient evidence presented to establish that it was in the best interest of the child to terminate Father's parental rights?

Father's Br. at 4 (trial court answers omitted).

Father maintains the trial court erred in terminating his parental rights because he had made progress toward completing his goals, his visits with Child were appropriate, and Child was happy to see Father. He further argues DHS did not present sufficient evidence to support a conclusion that termination of parental rights would be in Child's best interest.

When reviewing orders terminating parental rights, we must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa.2012)). Where "the factual findings are supported," we review the decision "to determine if the trial court

made an error of law or abused its discretion." *Id.* We defer "to trial courts that often have first-hand observations of the parties spanning multiple hearings," *id.*, and will reverse a decision "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will," *id.* (quoting *In re Adoption of S.P.*, 47 A.3d at 826). We will not reverse the trial court "merely because the record would support a different result." *Id.* (quoting *In re Adoption of S.P.*, 47 A.3d at 827).

The Pennsylvania Supreme Court has explained the reason for applying an abuse of discretion to termination decisions:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

To affirm the termination of parental rights, this Court need only agree with the trial court's determination as to any one subsection of section 2511(a), along with section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we conclude that the trial court properly terminated Father's parental rights pursuant to sections 2511(a)(2) and (b).

We will first review the trial court's conclusion that termination was proper under Section 2511(a)(2), which provides:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence of the following: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003). Further, we note that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *See In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004).

Here, in terminating Father's parental rights, the trial court noted that when DHS removed Child from the home, the home was uninhabitable due to the "collection of junk and trash," the children were unkempt, Z.L.K. had not been attending school, and the children had not received medical care. N.T., 10/4/2018, at 184. It further found that 30 months later, Father had not put himself "in a position to understand [his] Children[, a]nd once understanding them then be able to care for them." *Id.* at 185. The court stated it did not believe Father "benefitted one measure from all of the attendance at parenting classes." *Id.* at 186. Further, the court noted it did not have records or testimony from Father's therapist, and "[took] with a grain of salt everything [Father] says about how well he's adjusted." *Id.*

The trial court further referenced the objectivity of the case workers and supervisor, noting they saw "things completely different than the parents [saw] things." *Id.* It noted the current home became appropriate only within the preceeding few weeks and that the family "moved into another building rather than address the mess that they had created" in the prior house. *Id.* at 186-87. The court found parents did not take any concrete steps to put themselves in a position to parent Child. *Id.* at 187. The trial court further stated that "[f]rom the beginning when the Child was placed he became a different child." *Id.* The court did not believe that parents were capable of recognizing the issues. *Id.* It referenced the experts' opinions that the therapy and education have not improved Father's status as a parent, and noted that

Father was "unconnected to the reality and that's a safety factor for this Child going forward." *Id.* at 189-90. The trial court concluded:

> While they present this image that they've done everything they could it's meaningless because all they did was attend sessions, have not demonstrated that they've benefitted from any of this education. [They h]ave not demonstrated that they understand these Children or are able to now parent these children and keep them safe and provide for their wellbeing going forward.
>
> I think the record is clear and convincing that they're not able to parent [Child].

*Id.* at 188.

We conclude that the trial court's factual findings are supported by the record and it did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2). The conditions that existed upon removal establish "repeated and continued incapacity, abuse, neglect or refusal" that caused Child "to be without essential parental care, control or subsistence necessary for his physical or mental well-being." Further, the record supports the court's conclusion that Father continued to lack the capacity to parent Child.

We next address the trial court's conclusion that termination would best serve Child's developmental, physical and emotional needs and welfare under Section 2511(b). Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

> With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

The focus in terminating parental rights under section 2511(b) is not on the parent, but on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). Pursuant to section 2511(b), the trial court must determine "whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child." *See In re C.M.S.*, 884 A.2d 1284, 1286 (Pa.Super. 2005). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *Id.* at 1287. The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*.

The trial court noted Mr. Nelson's testimony that Child did not ask for Father, referred to his parents by their first names, referred to his foster parents as mom and dad, and seeks his foster parents for safety, comfort and to meet his daily needs. Trial Court Opinion, filed Jan. 24, 2018, at 40. It further noted that Dr. Ingles testified Child is well bonded to Foster Mother and that Child did not want to visit his parents. *Id.* It also referenced the bonding evaluation, which concluded Child would not suffer irreparable harm

- 12 -

if the trial court terminated Father's parental rights. *Id.* The trial court concluded that termination would best serve the Child's needs and welfare and Child would not suffer irreparable harm if Father's parental rights were terminated. *Id.* at 40-41. We conclude that the record supports this determination and the trial court did not abuse its discretion in terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/11/18